**Boleslavs MAIKOVSKIS, Petitioner,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

**No. 674, Docket 84–4143.**

United States Court of Appeals, Second Circuit.

Argued March 4, 1985.

Decided Sept. 17, 1985.

Ivars Berzins, Babylon, N.Y. (Joel A. Brenner, Ronald M. Organ, Ivars Berzins, P.C., Babylon, N.Y., on brief), for petitioner.

Rudolph W. Giuliani, U.S. Atty., for the Southern Dist. of New York, New York City (Neal M. Sher, Director, Michael Wolf, Deputy Director, Jeffrey N. Mausner, Trial Atty., Office of Special Investigations, Criminal Div., Dept. of Justice, Washington, D.C., Thomas E. Moseley, Asst. U.S. Atty., New York City, on brief), for respondent.

Before MANSFIELD, NEWMAN and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Petitioner Boleslavs Maikovskis petitions this Court pursuant to the Immigration and Nationality Act, as amended ("INA" or the "Act"), 8 U.S.C. § 1101 *et seq.* (1982), to review a unanimous decision of the Board of Immigration Appeals ("BIA" or the "Board") finding him deportable under § 241(a)(1) of the Act, 8 U.S.C. § 1251(a)(1), for having procured his immigration visa by means of willful misrepresentation of material facts, and under § 241(a)(19) of the Act, 8 U.S.C. § 1251(a)(19), for having assisted the Nazis in political persecution. On this petition, Maikovskis challenges the Board's finding of deportability under § 241(a)(1) on the ground that the Board incorrectly found his false statements to be material; he challenges the § 241(a)(19) finding of deportability on the grounds that he had inadequate notice that the Immigration and Naturalization Service ("INS") would rely on a certain series of events as a basis for the § 241(a)(19) charge and that, in any event, that charge was not proven. We reject these challenges and uphold the determinations of deportability under both sections.

## I. BACKGROUND

Maikovskis, a native of Latvia, entered the United States in 1951 on an immigrant visa issued under the Displaced Persons Act of 1948, Pub.L. No. 80-774, 62 Stat. 1009 (1948), as amended by Pub.L. No. 81-555, 64 Stat. 219 (1950) ("DP Act"). His application for admission pursuant to the DP Act stated that from December 1941 to October 1944 he had worked as a bookkeeper for the Latvian Railway Department in Riga, Latvia.

In 1976, INS instituted deportation proceedings against Maikovskis, initially invoking § 241(a)(1) of the Act, and later invoking § 241(a)(19) of the Act as well. Section 241(a)(1) provides for the deportation of any alien who

> at the time of entry was within one or more of the classes of aliens excludable by the law existing at the time of such entry.

8 U.S.C. § 1251(a)(1). The DP Act, at the time of Maikovskis's entry, made excludable any person who "willfully ma[d]e a misrepresentation for the purpose of gaining admission into the United States," § 10, 62 Stat. 1013, or "who advocated or assisted in ... persecution because of race, religion, or national origin," § 13, 64 Stat. 227. INA § 241(a)(19) provides for the deportation of any alien who

> during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with—
>
> (A) the Nazi government of Germany,
>
> (B) any government in any area occupied by the military forces of the Nazi government of Germany,
>
> (C) any government established with the assistance or cooperation of the Nazi government of Germany, or
>
> (D) any government which was an ally of the Nazi government of Germany, ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion.

8 U.S.C. § 1251(a)(19). As discussed in greater detail in Part III.A. below, the de-

portation proceeding was long and complex. Briefly, the grounds of INS's charges, as initially pleaded and as modified during the course of the hearings, were (1) that Maikovskis was deportable pursuant to § 241(a)(1) because statements in his DP Act application as to his employment during the period 1941–1944 were materially false, since in fact he had not been a bookkeeper for the railroad but had been chief of police in a Nazi-dominated police force in Rezekne, Latvia; and (2) that he was deportable under § 241(a)(19) because, in his position of police chief, he had assisted the Nazis in political persecution. Evidence presented at the deportation hearings before the Immigration Judge ("IJ") painted the following picture, much of which is not here disputed.

### A. *The Evidence*

At the time of the Nazi Germany invasion of the Soviet Union, Maikovskis lived in Rezekne. In July 1941, German forces reached Rezekne and established a local Latvian police unit under the command of the SS. Maikovskis volunteered for and obtained the position of Chief of the Second Police Precinct of the Rezekne District for the Nazi-created police force, a full-time job he held from about July 1941 until 1944.

Maikovskis was responsible for an area that included the village of Audrini, which had an ethnic Russian population of the Orthodox faith believed by the Germans to be inclined toward Communism. In December 1941, altercations occurred between Latvian police and Soviet partisans believed to be harbored in Audrini, and at least two Latvian police officers were killed.

Nazi authorities ordered that action be taken against Audrini, and, on or about December 22, 1941, Maikovskis ordered his Latvian police to join with German soldiers in arresting all of the Audrini villagers, totaling 200–300 men, women, and children; on or about January 2, 1942, pursuant to Maikovskis's orders, his policemen assisted the Germans in burning the village to the ground. INS introduced several authenticated documents relating to these events, one of which was a memorandum, which

Maikovskis acknowledged having signed, in which Maikovskis reported to his Latvian supervisor the mass arrests and burning of the village (hereinafter the "Audrini incident"). Maikovskis testified that he had had no choice but to order the mass arrests and burning of the village because the Nazis, through his Latvian superior, had ordered him to do so. Subsequently, in events with which Maikovskis denies involvement, about 30 of the Audrini villagers were publicly shot in the Rezekne market square, and the remaining villagers were transported to the nearby Anchupani Hills where they too were shot.

In order to show the materiality of Maikovskis's visa application misrepresentations, INS presented the testimony of the official who, as State Department vice consul in 1951, had issued Maikovskis's visa under the DP Act. She testified that if Maikovskis's application had revealed his police activities, Maikovskis would have been *per se* ineligible under the DP Act, and she would have denied him a visa. In an effort to show that his misrepresentations were not material, Maikovskis introduced witnesses who testified that some known members of the Latvian police in fact had not been excluded under the DP Act. These witnesses acknowledged, however, that a visa applicant who was known to have served in the Latvian police force would have had his background fully investigated.

### B. *The IJ's Decision*

As discussed in greater detail in Part III.A. below, the numerous charges asserted by the government against Maikovskis were eventually consolidated and numbered I through VII. As thus restated, Charges I through V and VII invoked § 241(a)(1), asserting that Maikovskis was deportable because of his misrepresentations in obtaining his visa (Charges I, II, and IV); because his entry was "prejudicial to the interest of the United States" (Charge III); because he had "advocated or ... assisted in the persecution of any person because of race, religion, or national origin" (Charge

V); and because he had "been a member of or participated in a movement which was hostile to the United States" (Charge VII). Charge VI invoked § 241(a)(19) and asserted that Maikovskis was deportable because he had

> ordered, incited, assisted or otherwise participated in the persecution of persons because of race, religion, national origin, or political opinion, under the direction of, or in association with, the Nazi government of Germany[,] any government in any area occupied by the military forces of the Nazi government of Germany, any government established with the assistance or cooperation of the Nazi government of Germany, or any government which was an ally of the Nazi government of Germany, during the period beginning on March 23, 1933, and ending on May 8, 1945.

In a decision dated June 30, 1983 ("IJ Decision"), the IJ found, *inter alia*, that Maikovskis had knowingly and intentionally failed to disclose that he had been a policeman in Rezekne during the period 1941 through 1943, and that in that period Maikovskis had participated or acquiesced in the arrest of a number of peaceful civilian inhabitants of Audrini and in the burning of their dwellings. The IJ nonetheless concluded that Maikovskis was not deportable under any of the seven charges lodged against him.

The IJ declined to find Maikovskis deportable on the basis of the misrepresentations in the visa application documents. He noted that, although Maikovskis had provided "obviously false" information as to his prior employment, that was insufficient to require deportation because "the Government must establish not only a misrepresentation which cut off a relevant line of inquiry, but one which would have led to a proper determination that he was ineligible for a visa. This they have not done." IJ Decision at 17.

With regard to the Audrini incident, the IJ concluded:

> The Government has not established that the respondent was excludable un-

der Sections 2, 10, or 13 [of the DP Act] as one who advocated or assisted in persecution. It has been shown that he participated in the arrest of the Audrini villagers and in the burning of the village under orders of the German invaders of Latvia, as a reprisal against the killing of one or more Latvian policemen. That event ultimately led to the Audrini massacre. There has been no suggestion of racist motivation in that atrocity. On this record, the respondent's complicity has not been shown to have gone beyond the arrests and the burning of the village. The ultimate violation of the laws of war which followed has not been shown to be either predictable, planned or inevitable. Charge V and Charge VI are therefore not sustained.

*Id.* at 18. The IJ ordered the deportation proceedings terminated.

### C. *The BIA's Decision*

The government appealed the IJ's decision to the Board, which, in a decision dated August 14, 1984 ("BIA Decision"), reversed, finding Maikovskis deportable under both § 241(a)(1) and § 241(a)(19).

First, with respect to the § 241(a)(19) charge, the BIA concluded that "even on the facts admitted by [Maikovskis] and found by the immigration judge, the respondent engaged in persecution of civilian populations" in connection with the Audrini incident. BIA decision at 21. The Board found, on the basis of expert testimony and numerous documents submitted at the hearing, that the Rezekne police force operated under the direction of the Nazis. It found, on the basis of Maikovskis's own testimony, that Maikovskis had assisted the Nazis in carrying out the mass arrests and burning of the village. The Board had no difficulty in concluding that the Audrini incident constituted persecution of the villagers. Noting that the legislative history of § 241(a)(19) indicated that Congress viewed "persecution" as including " 'the deliberate imposition of *severe economic disadvantage* or the *deprivation of* liberty, food, *housing,* employment *or other essen-*

*tials of life,'*" BIA Decision at 22 (quoting and emphasizing H.R.Rep. No. 1452, 95th Cong., 2d Sess. 5, *reprinted in* 1978 U.S. Code Cong. & Ad.News 4700, 4704), the Board stated that, even leaving aside the subsequent mass murders of the villagers, "the arrests of every inhabitant closely followed by the burning of their village constituted persecution of the civilian population," BIA Decision at 21.

Finally, the Board found that the persecution had been initiated because Soviet partisans had been found hiding in the village and because some of the villagers were apparently sympathetic to the Soviet cause. It concluded that

> the actions carried out against the Audrini villagers were initiated because of the political opinions held by some of the inhabitants. Under these circumstances, we have no difficulty in concluding that the persecution in which the respondent assisted was based on political opinion ....

*Id.* at 24. The Board rejected Maikovskis's contention that the Audrini incident was a nonpolitical response to the earlier killings of two Latvian policemen since there was no evidence of any attempt to ferret out the persons who did the killing, and the mass arrests and burning of the entire village went beyond any so-called necessary military retaliation.

With respect to the § 241(a)(1) charges, the BIA concluded that Maikovskis's concealment of his position as police chief was material and therefore rendered him deportable as asserted in Charges I, II, and IV. The BIA noted that all of the witnesses who testified as to the effect of Maikovskis's misrepresentations

> stated that, at the very least, further inquiry would have been made if the respondent had revealed that he was the police chief of the Second Precinct in Rezekne during World War II. It is fair to assume that further inquiry would have led [to] the discovery of other true facts, including disclosure of the respondent's role in the fate of Audrini, a vil-

lage within his precinct, and its inhabitants.

BIA Decision at 34.

### D. *The Issues on This Petition*

In petitioning this Court to review the Board's decision, Maikovskis challenges the BIA's findings of deportability under both § 241(a)(1) and § 241(a)(19). He contends that in finding deportability under § 241(a)(1) the BIA used an incorrect standard to assess the materiality of the misrepresentations in his visa application and that, in any event, those misrepresentations were not material. As to the § 241(a)(19) charge, he contends (1) that he was given inadequate notice that the Audrini incident would be relied on as a basis for that charge, and that he was therefore deprived of an opportunity to litigate the issue of whether the Audrini incident was motivated by one of the factors listed in § 241(a)(19), and (2) that the finding of deportability under § 241(a)(19) was erroneous because it was not demonstrated that the Audrini arrests and burning occurred "because of" the villagers' political opinion.

### II. DEPORTABILITY UNDER § 241(a)(1)

In challenging the BIA's determination that he was deportable under § 241(a)(1) on the ground that he had obtained his visa through fraud and misrepresentation, Maikovskis argues chiefly that the BIA applied the wrong standard in assessing the materiality of his misrepresentations and that his mispresentations were immaterial under any test. We disagree.

■ An alien who has made misrepresentations in his visa application documents is deportable on account of those misrepresentations only if they were material. *Fedorenko v. United States*, 449 U.S. 490, 507–08, 101 S.Ct. 737, 747–48, 66 L.Ed.2d 686 (1981); *see Chaunt v. United States*, 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960). In *Chaunt*, a denaturalization case, the Court concluded that, in order to revoke a citizenship decree because of misrepresentations, the government must establish

either (1) that facts were suppressed which, if known, would have warranted denial of citizenship or (2) that their disclosure might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship.

*Id.* at 355, 81 S.Ct. at 150. Although the Supreme Court has declined to resolve the issue of whether *Chaunt*'s materiality test for citizenship revocation applies to misrepresentations at the visa stage, *see Fedorenko v. United States*, 449 U.S. at 509, 101 S.Ct. at 748, all of the Courts of Appeals that have considered the issue deem the *Chaunt* test applicable to misrepresentations in visa application documents. *See United States v. Fedorenko*, 597 F.2d 946, 951 (5th Cir.1979), *aff'd on other grounds*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981); *Kassab v. INS*, 364 F.2d 806, 807 (6th Cir.1966); *United States v. Rossi*, 299 F.2d 650 (9th Cir.1962); *Langhammer v. Hamilton*, 295 F.2d 642, 648 (1st Cir.1961); *see also United States v. Palciauskas*, 734 F.2d 625, 628 (11th Cir.1984).

There is, however, disagreement as to the precise content of the second branch of the *Chaunt* test. Some have interpreted it as imposing on the government virtually the same burden as that imposed by the first branch, *i.e.,* the obligation to show that the undisclosed information "would" have led to the discovery of facts warranting denial of a visa. *See Fedorenko v. United States*, 449 U.S. at 518–26, 101 S.Ct. at 753–57 (Blackmun, J., concurring); *United States v. Sheshtawy*, 714 F.2d 1038, 1040–41 (10th Cir.1983); IJ Decision at 17. On the other hand, the second prong of *Chaunt* speaks in terms of a disclosure that "*might* have been useful in an investigation *possibly* leading to the discovery of other facts," 364 U.S. at 355, 81 S.Ct. at 150 (emphasis added), and others have concluded that the possibility, rather than the certainty, of discovery of disqualifying facts is sufficient to warrant the alien's loss of his fraudulently acquired rights. *See Fedorenko v. United States*, 449 U.S. at 526–29, 84 S.Ct. at 757–58 (White, J., dissenting); *United States v. Koziy*, 728·

F.2d 1314, 1320 (11th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 130, 83 L.Ed.2d 70 (1984); *Kassab v. INS*, 364 F.2d at 807. In *United States v. Oddo*, 314 F.2d 115 (2d Cir.), *cert. denied*, 375 U.S. 833, 84 S.Ct. 50, 11 L.Ed.2d·63 (1963), this Court, in affirming an order revoking citizenship on the basis of misrepresentation in the naturalization proceeding, stated that "[f]ailure to disclose a record of prior arrests, even though none of those arrests by itself would be sufficient ground for denial of naturalization, closes to the Government an avenue of enquiry which *might conceivably* lead to collateral information of greater relevance." *Id.* at 118 (emphasis added).

Maikovskis contends that the Board adopted the latter view of. *Chaunt* and applied a possibility test to judge the materiality of his misrepresentations and that this was error. We disagree with this interpretation of the Board's opinion and with the contention that its ultimate conclusion was erroneous. As we read the BIA Decision, the Board concluded that it was not necessary to determine whether the second branch of *Chaunt* imposed a certainty test or a possibility test, because it found that, if Maikovskis had revealed that he was police chief of the Rezekne precinct in which Audrini was located, "[i]t is fair to assume.that further inquiry would have led [to] the discovery of other true facts, including disclosure of the respondent's role in the fate of Audrini, a village within his precinct, and its inhabitants." BIA Decision at 34. The Board concluded that "[r]egardless of what standard of materiality is applied, then, the respondent's misrepresentations were material." *Id.*

■ It appears to us that the Board's standard—premised on its "fair ... assum[ption]" that investigation "would" have led to discovery of disqualifying facts—falls somewhere between the two interpretations of the second branch of *Chaunt*, and is, in essence, a "fair probability standard." Without reaching the question of whether the government would be entitled to prevail in a deportation proceed-

ing where it has shown only that the undisclosed facts might possibly have led to the discovery of disqualifying facts, we conclude that a reasonable probability standard is more appropriate than the certainty standard advocated by Maikovskis. In deportation proceedings, the government has the heavy burden of proving the facts on which it relies by "clear, unequivocal, and convincing evidence." *Woodby v. INS*, 385 U.S. 276, 286, 87 S.Ct. 483, 488, 17 L.Ed.2d 362 (1966). If material facts have successfully been concealed in the visa application documents, either by nondisclosure or by affirmative misrepresentation, the concealment has deprived the government of the opportunity to make an investigation into the alien's actual circumstances at a time when the truth would have been more easily discoverable. Thus, application of a certainty standard would encourage the alien to conceal material information in his visa application documents and reward him for the initial success of his nondisclosure. We conclude that once it has been shown that the alien made misrepresentations in his visa application, the materiality of the misrepresentations is established where the government shows that disclosure of the concealed information probably would have led to the discovery of facts warranting the denial of a visa.

■ Under this standard, Maikovskis's misrepresentations, which concealed his police service at the time of his visa application, were plainly material. We agree with the Board that disclosure of Maikovskis's position would probably have led to the discovery of his role in the Audrini incident, which would have led to his exclusion under the DP Act, and we consider this probability sufficient to establish the materiality of the misrepresentations and nondisclosures in his visa application documents. The fact that some known former Latvian policemen were allowed to enter the United States is of no moment. The witnesses who described the application process, including Maikovskis's witnesses, acknowledged that an applicant who was known to have served with the Latvian police would have had his background fully investigated

to determine whether he had assisted in persecution. This evidence, coupled with the evidence that many former Latvian policemen were denied entry under the DP Act, demonstrates that Maikovskis's misrepresentations cut off a relevant line of inquiry, preventing the immigration authorities from conducting a thorough investigation of his background to determine his eligibility on the basis of complete information.

We conclude that the Board correctly found that Maikovskis made material misrepresentations in his visa application, and we therefore affirm the determination that Maikovskis was deportable under · § 241(a)(1).

III. DEPORTABILITY UNDER § 241(a)(19)

■ Notwithstanding our conclusion that the Board's finding that Maikovskis is deportable under § 241(a)(1) should not be disturbed, we must reach the question of his deportability under § 241(a)(19) also, because the consequences of a finding of deportability under the latter subsection are potentially more onerous for Maikovskis. Whereas an alien found deportable under § 241(a)(1) may petition for and receive a discretionary ruling relieving him of the order of deportation, such relief is not available to an alien found deportable under subsection (a)(19). *See* INA § 241(f), 8 U.S.C. § 1251(f) (waiver of deportation unavailable); INA § 243(h)(2)(A), 8 U.S.C. § 1253(h)(2)(A) (withholding of deportation unavailable); INA § 244(a), 8 U.S.C. § 1254(a) (suspension of deportation unavailable).

In challenging the Board's finding of deportability under subsection (a)(19), Maikovskis argues principally that (1) he was not given adequate notice that the Audrini incident was to be used as a basis for urging his deportation under this subsection, and hence he was denied the opportunity to show that the Audrini events in which he participated were not motivated by a purpose listed in subsection (a)(19), and (2) the proof of the Audrini incident did not suffice to warrant a finding that his

conduct was motivated by a purpose listed in subsection (a)(19). We disagree with both contentions.

## A. *Notice of the Subsection (a)(19) Charge*

■ The deportation proceeding was instituted in 1976 by order to show cause and notice of hearing. In its initial petition and in several subsequent amendments, INS asserted some 10 charges of deportability against Maikovskis under § 241(a)(1). There were 30 factual allegations made in support of these charges, including several (originally numbered 23, 24, and 25) relating to the Audrini incident. As eventually recast and renumbered by the IJ (see below), these Audrini-related allegations were as follows:

11. You participated or acquiesced in the arrest of a number of peaceful civilian inhabitants of the village of Audrini, Latvia, in or about December, 1941.

12. You participated or acquiesced in the burning of the dwellings of a number of peaceful civilian inhabitants of the village of Audrini, Latvia, on or about January 2, 1942.

13. You participated or acquiesced in the execution of a number of peaceful civilian inhabitants of the village of Audrini, Latvia, at the location known as Anchupani Hills, on or about January 3, 1942.

In the original INS order to show cause, no mention was made of subsection (a)(19), for the simple reason that that subsection did not then exist.

In 1978, Congress added subsection (a)(19) to § 241, providing for the deportation of any alien who had, in association with the Nazis, "ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion." *See* Pub.L. No. 95–549, 92 Stat. 2065 (1978). In March 1980, INS modified its order to show cause to add the charge that Maikovskis was deportable under that subsection as well. INS's new charging document indi-cated that the subsection (a)(19) charge was based on the three new fact allegations there set forth "in addition to those set forth in the order to show cause and notice of hearing."

The evidentiary hearings in the proceedings were held from October 1977 through December 1977, and from July 1981 through March 1982. The lengthy hiatus occurred as the INS took depositions in Latvia and obtained a subpoena and an order compelling Maikovskis to testify in the hearings. Most of the hearings, and all of Maikovskis's testimony, took place after INS had modified its deportation petition to add the subsection (a)(19) charge.

Following the close of the evidence, the parties submitted posthearing briefs to the IJ. Maikovskis's brief argued that the essential elements of the subsection (a)(19) charge had not been proven because the government had failed to prove that the Audrini incident occurred because of the race, religion, or political opinions of the victims.

More than a year after the evidence was closed, and long after the posthearing briefs had been submitted, the IJ summoned the parties for a conference ("April 1983 conference") in an effort to clarify the INS charges and the factual contentions offered in support of them. The IJ consolidated INS's eleven charges into the seven charges described in Part I.B. above; he consolidated INS's 33 fact allegations into 16, three of which have been quoted in the present section; and he questioned the INS attorneys as to which of the factual allegations were offered in support of which of the seven charges. When the IJ reached Charge VI, the subsection (a)(19) charge, the government identified the factual allegations on which it relied, and expressly disclaimed reliance on allegations 11–13:

THE COURT: And you do not include 11, 12 and 13 ... right?

MR. MAUSNER: That is correct.

In preparing his decision, issued two months after this conference, the IJ prepared a chart, indicating which allegations

the government had stated it offered in support of which charge. Allegations 11, 12, and 13 were not shown as having been offered in support of the subsection (a)(19) charge.

On the basis of the statements of the government attorneys at the April 1983 conference, and the IJ's chart omitting allegations 11, 12, and 13 as asserted bases for the subsection (a)(19) charge, Maikovskis contends that he was not given adequate notice that the Audrini incidents would be used as a basis for seeking his deportation under subsection (a)(19). He argues that since he was unaware of the nexus between the Audrini incident and the (a)(19) charge, the issue of whether the Audrini incidents occurred "because of" the villagers' political opinion, as found by the BIA, was never adequately explored. Although we believe that, in light of INS's disclaimer at the April 1983 conference, the IJ and the BIA would have been within the bounds of discretion to disregard the Audrini incidents in considering the (a)(19) charges, we reject Maikovskis's contention that that disclaimer is a basis for overturning the Board's decision that he is deportable under that subsection since we are unable to see that Maikovskis lacked appropriate notice of any meaningful stage or that he was prejudiced in any way by the course of events.

First, we note that Maikovskis had ample notice early in the proceedings that the Audrini incident would be the basis for some INS charges. The factual allegations were included in an early amendment to INS's order to show cause and notice of hearing; and Charge V asserted that Maikovskis was deportable because he had assisted in the persecutions of persons "because of" race, religion, or national origin. When INS modified its deportation petition in 1980, it stated that the factual allegations already made were invoked in support of the newly added § 241(a)(19) charge. This should have sufficed to alert Maikovskis that INS contended that the Audrini incident occurred "because of" the villagers' race, religion, national origin, or political opinion. And, indeed, the facts surrounding the Audrini incident appear to have been the subject of considerable testimony at the evidentiary hearings, which concluded in March 1982.

The government disclaimer relied upon by Maikovskis in his petition to this Court did not occur until more than a year after the conclusion of the hearings; thus, Maikovskis could not have relied on it in fashioning the proof he wished to present at the hearings. And certainly he did not rely on it in arguing his case to the IJ, for he fully presented in his posthearing brief to the IJ the very point he now contends that the government disclaimer prevented him from developing at the hearing. That brief contended that the subsection (a)(19) charge had not been proven because the subsection required, *inter alia*, that "[t]he persecution must have been motivated by considerations of race, religion, national origin, or political opinion" (Maikovskis Post Hearing Memorandum at 27), and that "[o]ther motives, no matter how base and despicable, plainly are not within the statutory scheme" (*id.*). Maikovskis argued that the Audrini "massacre was obviously motivated by strategies from the struggle against guerillas, regardless how base those strategies might actually be. It has nothing to do with race or religion." (*Id.* at 27–28.) His brief concluded that

> [t]he government's evidence is insufficient to establish that respondent personally participated in persecution of others because of race, religion, national origin or political opinion.

(*Id.* at 28.)

Finally, although the IJ's charge/allegation chart reflected the government's disclaimer as to allegations 11–13, the IJ apparently did consider the Audrini incident in connection with the charge of deportability under subsection (a)(19), Charge VI. Thus, he noted that, as to "the specific allegations numbered 10 through 16," "[p]roof of some or all of those, coupled with number 6 would [possibly] support ... Charge ... VI." IJ Decision at 12. And, after finding several allegations including

11 and 12 proven, the IJ stated that the government stated that those "findings would sustain Deportability under Charge ... VI ...." *Id.* at 17. Thus, notwithstanding the chart and the earlier disclaimer, the IJ's opinion reveals that both the IJ and the government continued to view the Audrini incident, as set forth in allegations 11 and 12, to be pertinent to the subsection (a)(19) ground asserted in Charge VI.

In light of the course of the administrative proceedings and the arguments actually advanced by Maikovskis in those proceedings, we are unable to conclude that Maikovskis lacked notice at any meaningful stage that the Audrini incident would be a basis for deportation under subsection (a)(19), and we see no prejudice to Maikovskis from the INS disclaimer at the 1983 conference.

### B. *The Merits of the Subsection (a)(19) Decision*

Maikovskis attacks the Board's finding of deportability under § 241(a)(19) on the grounds that the evidence did not support either the conclusion that he personally was motivated by the Audrini villagers' political opinion in ordering his policemen to assist the Nazis in arresting the villagers and burning the village, or the conclusion that the Nazis' order to him was motivated by the villagers' political opinion. We conclude (1) that under the proper interpretation of subsection (a)(19), INS was not required to prove Maikovskis's own personal motivation so long as it proved, by clear, unequivocal, and convincing evidence that the persecution of the Audrini villagers, in which Maikovskis participated, was undertaken "because of" their political opinion; and (2) that under the proper standard of review, the Board's finding that the persecution was undertaken "because of" the villagers' political opinions must be upheld.

### 1. *The Requirements of Subsection (a)(19)*

█ Section 241(a)(19), quoted in full in Part I above, provides that an alien is deportable if he or she, "under the direction of, or in association with" the Nazis "ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion." Maikovskis argues that under this provision the government must prove that his own intention was to persecute the Audrini villagers on account of their political opinion. We disagree.

To begin with, the syntax of subsection (a)(19) suggests that the alien's personal motivation is not paramount. The structure of the subsection indicates rather that the Nazis' course of persecution must be shown to have been motivated by one of the listed factors. If, on the other hand, Congress had intended the interpretation of the subsection advanced by Maikovskis, it could simply have relocated the "because of" phrase to the beginning of subsection (a)(19), where it would have referred to the phrase "alien ... who" earlier in subsection (a). Thus, Congress could have provided for the deportability of an "alien who, because of the victims' political opinion [etc.], assisted" in persecution by the Nazis. This is not, however, the way the statute was framed. As we read the actual language of subsection (a)(19), it does not require proof that the alien identified himself with the Nazis' basis for persecution; if the Nazi persecution occurred "because of" political opinion, the alien who assisted or otherwise participated in it is subject to deportation under subsection (a)(19). *Cf. Fedorenko v. United States,* 449 U.S. at 512, 101 S.Ct. at 750 (declining to read § 2(a) of the DP Act, which makes ineligible for visas individuals who assisted the enemy in persecuting civilians, as making ineligible only those who voluntarily assisted in such persecution).

This reading of the language of subsection (a)(19) finds support in the legislative history of the subsection. The 1978 amendments to the Immigration and Nationality Act, which included the enactment of § 241(a)(19), were designed, *inter alia,* to establish within the permanent United States immigration laws provision for the

exclusion of aliens who have participated in persecution. Such provisions had appeared previously in special refugee measures such as the DP Act. *See* H.R.Rep. No. 1452, 95th Cong., 2d Sess. 3, *reprinted in* 1978 U.S.Code Cong. & Ad.News 4700, 4702 [hereinafter cited as House Report]. As to the precise focus of § 241(a)(19), the report of the House of Representatives Committee on the Judiciary stated as follows:

> In making a "persecution" determination, emphasis should be placed on the governmental nature of the conduct involved. Isolated instances of mistreatment on the part of one individual against another, without Government support or complicity, would clearly not meet that criterion.

House Report, *reprinted in* 1978 U.S.Code Cong. & Ad.News 4700, 4706.

In sum, the language, the purpose, and the legislative history of subsection (a)(19) support the conclusion that the government need not prove that the alien's assistance to the Nazis in the course of their persecution because of the victims' political opinion was motivated by the same political animus on the part of the alien.

We do not mean to suggest by this ruling either that an alien's inactive membership in an organization bent on politically-based persecution or that his tangential provision of services to such an organization would suffice to show that the alien assisted or otherwise participated in such persecution within the meaning of subsection (a)(19). As the Court noted in *Fedorenko*,

> an individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language

about persons who assisted in the persecution of civilians. Other cases may present more difficult line-drawing problems but we need decide only this case. 449 U.S. at 512–13 n. 34, 101 S.Ct. at 750 n. 34. As with the case of the concentration camp guard in *Fedorenko*, there is little difficulty in determining that a police chief who, on orders from the Nazis, ordered his men to arrest all of the inhabitants of a village and burn the village to the ground has assisted in persecution.

### 2. *The Validity of the Board's Finding*

 In reviewing a BIA order of deportation, courts are required to give substantial deference to the Board's findings of fact. *Wong Wing Hang v. INS*, 360 F.2d 715, 717 (2d Cir.1966). Those "findings of fact, if supported by reasonable, substantial, and probative evidence on the record considered as a whole, shall be conclusive …." 8 U.S.C. § 1105a(a)(4); *see Foti v. INS*, 375 U.S. 217, 222–23, 84 S.Ct. 306, 310–11, 11 L.Ed.2d 281 (1963). We conclude that in the present case the record as a whole contains reasonable, substantial, and probative evidence that the mass arrests of the Audrini villagers in December 1941 and the burning of the village a few days later were undertaken "because of" the villagers' political opinions and that Maikovskis assisted in this persecution.

First, there was ample evidence that Maikovskis actually assisted the Nazis in the persecution of the Audrini villagers. Maikovskis testified that, in response to a German directive, he ordered his police to assist the German soldiers in the mass arrest of the Audrini villagers and the burning of the village. Maikovskis's orders were followed, and he thereafter signed and sent a report to his Latvian superior, stating that "on orders of the German authorities, all the residents of Audrini Village, Makaseni County, were imprisoned, but the village itself was burned."

As to the motivation for the persecution of persons because of their political opinion within the meaning of § 241(a)(19), the Board made the following finding:

The inhabitants of Audrini, who were Latvian, and whose faith was apparently Orthodox (Tr. at 363), were persecuted because Soviet partisans had been found hiding in the village. *As a result of the fact that some of the villagers were apparently sympathetic to the Soviet cause, all were arrested, and eventually killed, and the village was burned.* The dragnet was large, and no doubt encompassed some who were not sympathetic to the Communists, and who in fact may have held no political views at all. Nevertheless, *the actions carried out against the Audrini villagers were initiated because of the political opinions held by some of the inhabitants.* Under these circumstances, we have no difficulty in concluding that the persecution in which the respondent assisted was based on political opinion and comes within the meaning of section 241(a)(19).

In view of all the foregoing, we find, by clear, unequivocal, and convincing evidence that the respondent, under the direction of, and in association with, the Nazi German government, assisted and otherwise participated in the persecution of persons because of political opinion. Therefore, the respondent is deportable under section 241(a)(19) of the Act, and the sixth charge made against the respondent is sustained.

BIA Decision at 24 (emphasis added; footnote omitted). In support of this finding, the record includes expert testimony that, as a general matter, the local police were always used by the Nazis during "purges of undesirable elements," Testimony of Dr. Wolfgang Scheffler at 73, among whom the Nazis included Communists, *id.* at 47. This testimony was supported by many documents dated during the period surrounding the Audrini incident, and Maikovskis's tenure as police chief. Some of these documents reflected the Nazi regime's desire to rid Latvia of Communists, and some indicated that the villages surrounding Rezekne, including Audrini, were suspect for political reasons.

For example, a July 1941 SS report, referring to the area surrounding Rezekne, stated: "[s]tarting July 7 the surrounding towns and forests will be systematically combed for members of the Red Army and native Communists.... The police detachments have been instructed to bring leading Communists into the jail at Rezekne." An SS report for the period "up to 15 October 1941" described these efforts in the Baltic area, stating, *inter alia*:

"2. *Combating Communism*

Everywhere in the area of operation counteractions against communism and Jewry took first place in the work of the Security Police.

....

b) *Search for and Arrest of Communists.*

... [A] systematic search was made for Communist functionaries, Red-Army soldiers, and persons more seriously suspect because of their activities for Communism....

....

The extent of this cleansing in line with the counteractions against Communism may be seen in the survey on encl. 8 which gives the number of people executed."

A copy of a document dated December 31, 1941, which bore an indication that the original had been signed by Maikovskis's immediate supervisor, stated that "[d]uring the last six months, our work has been dominated by [*inter alia*] our desire to free ourselves of Communist and Jewish leftovers ...." And an SS report dated February 2, 1942, subsequent to the Audrini incident, noted:

The inhabitants of the village of Audrini are Russians—of orthodox faith—all told 48 families. Blind in their nationalism, they supported the Red Armyists 100%. In this village of Audrini there lived 5 armed Red Army men, 3 former members of the Militia, 3 prisoners of war who had escaped from prison camps, and 11 former prisoners of war.

We conclude that the evidence in the administrative record provided reasonable, substantial, and probative support for the

BIA's finding that the Nazis persecuted the Audrini villagers because of their political opinions.

Maikovskis urges that we reach the opposite conclusion on the basis that two Latvian policemen had earlier been killed by Communist partisans thought to be hiding in the village of Audrini and that the Audrini incident was a military or law-enforcement response to these killings. The Board rejected this contention, noting that there was no evidence that any attempt had been made to ferret out those who had shot the policemen or those ·who had harbored the killers. It could only conclude that such "wanton destruction and general penalty" as occurred constituted persecution of the type targeted by Congress in § 241(a)(19). BIA Decision at 23. Even if the Board's decision may be read as finding that the Audrini incident was in part a result of the earlier killing of the two policemen, it is clear that the Board concluded that political opinion was the principal motivating factor in the persecution. Since we see no basis in the statute for requiring that the government prove that political opinion was the sole motivation for the persecution, and since we conclude that there was adequate support for the finding that the villagers' political opinions were at least a major motivation for the persecution, we reject Maikovskis's contention· that the earlier killing of the two Latvian policemen meant that the mass arrests and wholesale arson did not occur "because of" political opinion.

Finally, we are unpersuaded by the argument that because the Board hypothesized that perhaps not all of the Audrini villagers were Communist sympathisers, the mass arrests and wholesale arson should not be viewed as having been undertaken "because of" the villagers' political opinions. The documents introduced at the hearing provided ample evidence that the Nazis sought to rid the Rezekne area of Communists; and no evidence was forthcoming to explain in any other way the wholesale scope of the arrests and burning of the entire village. The evidence in the record as a whole thus justified the Board's finding that the persecution was undertaken because of the villagers' political opinions.

We have considered all of Maikovskis's other arguments in support of this petition for review and have found them to be without merit.

CONCLUSION

The petition for review is denied.

JON O. NEWMAN, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that Maikovskis was properly found deportable under section 241(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(1) (1982), for failure to disclose his police service during the Nazi occupation of Latvia, a disclosure that would probably have led to knowledge of his role in the Audrini episode, which in turn would have warranted his exclusion under the Displaced Persons Act. But I respectfully dissent from the additional holding that Maikovskis has .properly been found deportable under section 241(a)(19) of the Act, 8 U.S.C. § ·1251(a)(19), for participation in an act of political persecution. The additional ground renders Maikovskis ineligible for discretionary relief under sections 241(f), 243(h)(2)(A), and 244(a) of the Act, 8 U.S.C. §§ 1251(f), 1253(h)(2)(A), and 1254(a) (1982), a matter of significance to this 81-year-old man who has resided in this country for 33 years.

The issue under section 241(a)(19) is whether Maikovskis participated in persecution of the Audrini villagers "because of" their "political opinions." The horror of the episode, still vivid despite the passage of 44 years, must not deter us from requiring faithful compliance with applicable substantive and procedural requirements of administrative law. This is especially so when the administrative task is the difficult one of determining the precise motivation for actions taken four decades ago during a war. Though the events of the episode were properly found by the Board of Immigration Appeals (BIA), the

issue of motivation, on which the applicability of section 241(a)(19) turns, has not, in my view, been properly resolved by the Board, nor has Maikovskis been accorded a fair opportunity to participate in the resolution of that critical issue.

The key facts may be briefly summarized. In December 1941, while Germany and the Soviet Union were at war, Soviet partisans hiding in the Latvian village of Audrini, then under German occupation, killed at least two Latvian police officers. As a reprisal for those killings and as a warning to other villages not to harbor Soviet partisans, the Nazis ordered swift and brutal retaliation: All the villagers of Audrini, some 200 to 300 men, women, and children, were arrested and shot, and their village was burned to the ground. Boleslavs Maikovskis, a Latvian native, had been installed by the Nazis as chief of a police precinct for the area that included Audrini. Maikovskis ordered his Latvian police officers to assist German soldiers in arresting the villagers and burning their town. It is not clear whether he or his police officers played any role in shooting the villagers.

1. *The merits of the section 241(a)(19) decision.* The persecution charge presented the BIA with a difficult question of ascertaining motive. Were the Audrini villagers arrested and shot as an act of reprisal for the harboring of the partisans who had shot the Latvian policemen, or as a persecution of the villagers for the political opinions held by some of them, or for both reasons, with political persecution of sufficient significance to satisfy the motivation requirement of the statute?

The BIA answered this difficult question with the following sentences:

The inhabitants of Audrini, who were Latvian, and whose faith was apparently Orthodox, were persecuted *because* Soviet partisans had been found hiding in the village. As a result of the fact that some of the villagers were apparently sympathetic to the Soviet cause, all were arrested, and eventually killed, and the village was burned. The dragnet was large, and no doubt encompassed some who were not sympathetic to the Communists, and who in fact may have held no political views at all. Nevertheless, the actions carried out against the Audrini villagers were initiated *because* of the political opinions held by some of the inhabitants. Under these circumstances, we have no difficulty in concluding that the persecution in which [Maikovskis] assisted was based on political opinion and comes within the meaning of section 241(a)(19).

(citations omitted) (emphasis added).

As this critical excerpt makes clear, the BIA has made two findings as to motivation but offered no reasoned explanation as to how or whether the findings fit together. The first sentence says flatly that the persecution occurred "because Soviet partisans had been found hiding in the village." These were the partisans who had shot the Latvian policemen. Thus the BIA finds that the persecution was an act of reprisal. Then the BIA says the action was "initiated because of the political opinions held by some of the inhabitants." If true, this would be the political motivation required for deportation under section 241(a)(19). But the BIA has not offered a word of explanation to assist us in reviewing these two facially inconsistent findings. Indeed the BIA has not even recognized that its findings create an issue of dual motivation, nor provided any basis for determining how it resolved the issue, much less whether it did so in conformity with the standard enunciated in the majority opinion. Several possibilities come to mind. The action was essentially an act of reprisal, as the BIA first concludes. Or the action was essentially an act of political persecution with reprisal only a pretext for taking action against Communist sympathizers. Or the action was based on dual motivation with reprisal the initiating cause and political motivation the reason for the extent and severity of the reprisal action. Or the BIA has not fully appreciated the problem of dual motivation and has yet to determine precisely what its thinking is as to the

extent to which political motivation prompted the action.

We have been given an inadequate basis for determining the correctness of the administrative decision. What little may be gleaned from the BIA's account of the episode serves only to perpetuate uncertainty. For example, the BIA states, "The burning of the entire village of Audrini hardly served the claimed purpose of ferreting out and punishing only the guilty villagers." That observation does not show that political motivation was present in addition to reprisal motivation; it simply fails to reckon with the brutality of wartime reprisals. If the Nazi occupiers had identified only the specific villagers who had harbored the partisans who had shot the policemen, retribution against these individuals would have been punishment, not reprisal. The whole point of wartime reprisal, offensive as it may be, is to inflict suffering and even death on innocent persons to deter others from future hostile acts out of concern for the plight of innocent victims.

A reasoned explanation could readily be supplied if the evidence showed that in some villages in Nazi-occupied territories retribution for harboring partisans who had shot local collaboraters was normally confined to guilty individuals, with mass reprisal action, such as that taken in Audrini, occurring only in communities with significant political sympathy for Communists or others opposed to the occupying regime. But we have no reason to believe that the BIA views the evidence in this light, and it is far from clear that such a conclusion would be warranted on this record.

I agree with the majority that the BIA need not find that political motivation was the "but for" cause of the Audrini massacre. Unlike dual motivation issues that arise in the context of adverse action based on both improper conduct and protected activity such as exercise of First Amendment rights, see *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), or rights under the National Labor Relations Act, see *N.L.R.B. v. Charles Bat-*

*chelder Co.*, 646 F.2d 33 (2d Cir.1981), there is no need to protect acts of wartime reprisal. Whatever the status of such actions under military or international law, we need not insist that political motivation be the "but for" cause of the persecution that is grounds for deportation under section 241(a)(19) since action taken in part as a wartime reprisal may properly be a basis for deportation without impairing any protected right of the alien. I therefore agree with the majority that political opinion need be only a "major motivation" for the persecution that occurred at Audrini. However, I do not agree that the BIA has provided a reasoned explanation from which we can determine whether it has properly analyzed the problem of dual motivation presented by the case and fairly determined that political opinions were a "major motivation" for the fate of the Audrini villagers.

2. *Procedural fairness in reaching the section 241(a)(19) decision.* In light of the importance of careful consideration by the BIA of the dual motivation issue, it is essential that Maikovskis be afforded a full and fair opportunity to challenge before the BIA the Government's contention that the political opinions of the Audrini villagers were a sufficient motivation for the massacre to justify deportation under section 241(a)(19). Regrettably, the actions of the Government denied Maikovskis that opportunity. The Audrini episode was withdrawn from the case as a basis for seeking to establish deportation under section 241(a)(19), and, on the administrative appeal by the Government to the BIA, no claim was made that the Audrini episode constituted grounds for finding Maikovskis deportable under that subsection. Maikovskis has thus been denied the most elemental aspect of due process—an opportunity to be heard.

As the case was initially presented to the Immigration Judge, the charge of deportation under section 241(a)(19) was sought to be supported by various specific allegations, three of which concerned the Audrini episode. The events at Audrini were included in Allegations 11, 12, and 13. After

the hearing record was closed, the Immigration Judge met with counsel for both sides in an effort to clarify and, if possible, narrow the issues on which decision was required. At the conference the Government explicitly stated that it was not relying on the Audrini episode in support of Charge VI, the only charge brought under section 241(a)(19). The Immigration Judge made inquiry to pin the matter down:

> The Immigration Judge: And you do not include 11, 12 and 13 ... right?
>
> Counsel for the Government: That is correct.

A chart of the charges and those factual allegations relied on by the Government in support of the charges was prepared by the Immigration Judge and shows that Allegations 11, 12, and 13 formed no part of Charge VI. The Government has not claimed otherwise.

After the Immigration Judge ruled in favor of Maikovskis, the Government appealed to the BIA. The Government's briefs before the BIA make it absolutely clear that it was not seeking deportation under section 241(a)(19) based on the Audrini episode. Having disclaimed reliance on Allegations 11, 12, and 13 in support of Charge VI before the Immigration Judge, the Government sought to have the BIA consider the Audrini episode solely in connection with the claim that Maikovskis should be deported as a person who was excludable under the Displaced Persons Act. Unlike section 241(a)(19), the Displaced Persons Act makes no mention of political motivation in describing persecution, participation in which renders a person excludable. In urging the BIA to find that Maikovskis was excludable under the Displaced Persons Act, the Government relied exclusively on section 2 of that Act, which bars from entry those who "assisted the enemy in persecuting civil popula-

tions."[1] The claim that Maikovskis was excludable under the Displaced Persons Act was set forth in Charges II, V, and VII, not Charge VI, the only charge that alleged deportability under section 241(a)(19). Having abandoned the Audrini episode as a basis for seeking deportation under section 241(a)(19), the Government made no argument whatever that the Audrini massacre was motivated by any of the factors listed under section 241(a)(19). Indeed, responding to the Immigration Judge's finding that the massacre had not been racially motivated, the Government argued that the persecution of the Audrini villagers "does not have to be based on race, religion or national origin. The inhabitants of Audrini were persecuted because they lived in Audrini." Government's Brief to the BIA at 22–23 (footnote omitted). The Government's only claim about the Audrini episode on its appeal to the BIA was that Maikovskis' conduct there made him "ineligible [for entry] under the DP [Displaced Persons] Act." *Id.* at 57.

The majority does not challenge Maikovskis's essential point that due process does not permit a government agency to abandon an allegation and later proceed against a person on the basis of that allegation. Instead, the majority maintains that the Government's disclaimer does not require a remand of the section 241(a)(19) determination because Maikovskis originally had notice of the allegation and was not prejudiced by the subsequent disclaimer. With deference, I do not believe these considerations adequately reckon with the serious procedural flaw that has occurred. The notice recounted by the majority concerns the procedural stages of this case *before* the Government's appeal to the BIA. It is true that Maikovskis initially had notice that the Audrini episode would be

---

1. Section 2 of the Displaced Persons Act of 1948 incorporated the definition of "displaced person" contained in Annex I of the Constitution of the International Refugee Organization (IRO). Act of June 25, 1948, 62 Stat. 1009 (1948), as amended by Act of June 16, 1950, 64 Stat. 219 (1950). The IRO Constitution precluded from "displaced person" status any person who "assisted the enemy in persecuting civil populations." Section 13 of the Displaced Persons Act, as amended in 1950, prohibited the issuance of visas under the Act to any person who "assisted in the persecution of any person because of race, religion, or national origin." 64 Stat. 227.

urged in support of Charge VI. That notice may well have alerted him to the need to place in the record his evidence in defense of Charge VI. But Maikovskis is not contending that he lacked a fair chance to present evidence; his point is that, after prevailing before the Immigration Judge, he lacked a fair chance to persuade the BIA, on the Government's appeal, that the administrative record does not support a finding by the requisite standard of proof, see Woodby v. I.N.S., 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966), that the Audrini episode was based on political motivation sufficient to satisfy section 241(a)(19). That opportunity was foreclosed by the Government's action, first, in disclaiming any reliance on the Audrini episode in support of Charge VI, and, second, in pursuing the appeal to the BIA without any mention that the Audrini episode was being reclaimed as a basis for deportation under section 241(a)(19).

This absence of notice that political motivation for the events at Audrini would be at issue on the appeal to the BIA cannot, in my view, be said to have caused Maikovskis no prejudice. Unless appellate advocacy, whether before judicial or administrative tribunals, is to be deemed worthless, what happened in this case denied Maikovskis a significant opportunity to present his side of the dual motivation issue, a matter, as I have indicated above, that is exceedingly troublesome. This is not simply a case where an agency has relied on a fact adequately supported by the record though not particularly emphasized by the Government during the process of administrative appeal. Here the key issue of political motivation was explicitly taken out of the case by the Government's disclaimer before the Immigration Judge and kept out of the case on the appeal to the BIA.

In sum, this case should be returned to the BIA for further consideration of the section 241(a)(19) ground of deportation for two reasons: The BIA has not provided a reasoned explanation as to how it concluded that political opinions of the Audrini villagers were a sufficient motivation for the Audrini episode, beyond the BIA's stat-

ed reason of wartime reprisal, to satisfy section 241(a)(19), and Maikovskis has not been accorded a fair opportunity before the BIA to present his side of the political motivation issue. Perhaps, after notice to Maikovskis that political motivation will be the issue on the administrative appeal and despite his counsel's argument, the BIA upon reconsideration could articulate a rationale for concluding that arresting and shooting all the villagers was not only an act of wartime reprisal but also a persecution based on their political beliefs. But such notice and opportunity to be heard have not yet been afforded, and Maikovskis should not be deported under section 241(a)(19) unless and until a procedurally and substantively valid decision has been made.