**UNITED STATES of America, Appellant,**

v.

**Juozas KUNGYS.**

No. 83–5884.

United States Court of Appeals, Third Circuit.

Argued Jan. 7, 1986.

Decided June 20, 1986.

Neal M. Sher, Director, Michael Wolf, Deputy Director, Samuel Rosenthal (Argued), Chief Appellate Section, Joseph F. Lynch and Jovi Tenev, Trial Attys., U.S. Dept. of Justice, Crim. Div., Office of Sp. Investigation, Washington, D.C., for appellant.

Donald J. Williamson (Argued), Williamson & Rehill, P.A., Newark, N.J., Ivars Berzins, Babylon, N.Y., for appellee.

Before ADAMS, SLOVITER and MANSMANN, Circuit Judges.

### OPINION OF THE COURT

MANSMANN, Circuit Judge.

In this appeal from a judgment in favor of the defendant, 517 F.Supp. 1104, Juozas Kungys, in a denaturalization proceeding, we are asked to determine whether certain undisputed misrepresentations or concealments which were made by the defendant on his visa application and which were repeated in connection with his naturalization petition are material within the meaning of 8 U.S.C. § 1451(a) and *Chaunt v. United States*, 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960). Our review requires us to examine the second prong of the *Chaunt* test which has not been construed previously by this court nor explained by the Supreme Court. Because we find the defendant's willful misrepresentations and concealments concerning his identity to be material under our interpretation of the controlling standards, we reverse the judgment of the district court and remand for denaturalization proceedings.

### I.

The jurisdiction of the district court was predicated upon 8 U.S.C. § 1451(a) and 28 U.S.C. § 1345. This court has jurisdiction by virtue of 28 U.S.C. § 1291 since this is an appeal from a final decision of the district court.

### II.

Insofar as our review involves findings of fact made by the district court after a non-jury trial, our review is limited to the clearly erroneous standard. *See, e.g., Leeper v. United States*, 756 F.2d 300, 308 (3d Cir.1985). As to questions of law, however, we utilize the "fullest scope of review," *i.e.*, plenary review. *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 102 (3d Cir.1981).

### III.

The government, through the Office of Special Investigations of the Department of Justice, commenced this action pursuant to 8 U.S.C. § 1451(a) to revoke the citizenship of Juozas Kungys, who had procured a nonpreference quota immigration visa in Stuttgart, Germany in 1947, had emigrated to this country in 1948, and was naturalized in Newark, New Jersey in 1954.

In these proceedings before the district court, the government sought to denaturalize the defendant on the ground that his citizenship was illegally procured or was procured by concealment of a material fact because: (i) he allegedly participated with the armed forces of Nazi Germany in exe-

cuting over 2,000 unarmed Lithuanian civilians, most of them Jewish, during July and August of 1941; (ii) he allegedly willfully concealed and misrepresented certain material facts in his visa application and in his naturalization petition; and (iii) he allegedly lacked the requisite "good moral character" as defined in 8 U.S.C. § 1101(f)(6), purportedly because he committed the aforementioned atrocities or alternately because he gave false testimony to obtain benefits under the Immigration and Nationality Act.

After trial non-jury the district court made numerous findings of fact and conclusions of law and entered judgment for the defendant on all counts. *See United States v. Kungys*, 571 F.Supp. 1104 (D.N.J. 1983). The facts and background are detailed by the district court and will not be reiterated fully here, particularly since the issues upon which we resolve this matter require us to apply and interpret legal precepts rather than examine the factual findings. Given the nature of the right at stake in a denaturalization proceeding, however, it is important for the appellate court to review carefully the record in the district court, and we have done so here. *See, e.g., Fedorenko v. United States*, 449

U.S. 490, 505–06, 101 S.Ct. 737, 746–47, 66 L.Ed.2d 686 (1981), and cases cited therein.

It was the government's principal contention that the defendant participated with occupying Nazi forces in the extermination of segments of the Lithuanian Jewish population. More specifically, in Kedainiai, Lithuania on July 23, 1941 and August 28, 1941 over 2,000 unarmed Jewish men, women and children were divided into groups, forced into a ditch, directed to undress and shot to death. Their bodies were then covered with earth and lime before the next doomed procession was forced to follow.

During the trial, in order to demonstrate the defendant's role in the Kedainiai killings, the government offered into evidence several videotaped depositions which were taken in the Soviet Union specifically for use in this case.[1] Although the district court candidly noted that, if unqualifiedly admitted, the depositions would have been sufficient to prove that the defendant was a participant in the Kedainiai murders, the district court did not admit the depositions for all purposes. These depositions were received into evidence only for the limited purpose of establishing that these atrocities actually transpired. Without the unre-

---

1. Three Soviet witnesses in particular gave videotaped testimony which implicated the defendant in the Kedainiai atrocities: Vladislovas Silvestravicius, Juozas Kriunas and Jonas Dailide. The testimony of each is summarized below.

In 1941, Vladislovas Silvestravicius worked as a driver in a Kedainiai beer bottling plant. He testified that on August 28, 1941, on orders of his superiors, he presented himself to the Kedainiai police station where he picked up lime, beer and vodka. He further stated that his truck was utilized to transport the elderly to the execution ditch referenced above. He testified that the defendant gave orders in Kedainiai on that day and that a person in a photograph shown to him for identification "resembled" the defendant.

Juozas Kriunas, who was imprisoned by the Soviet government for his part in the Kedainiai murders, testified that the defendant was a leader in a detachment which was organized to assist the occupying German forces. With respect to the July atrocities, the witness stated that the defendant told him of the defendant's personal participation in the shootings. Kriunas further testified from personal observation

that on August 28, 1941, the defendant ordered the victims in the vicinity of the pit to undress and participated in shooting them with his own pistol. Curiously, however, Kriunas could not identify a photograph of the defendant taken during the war.

Jonas Dailide, at the time of the German invasion, was a boarder in the same rooming house as the defendant. Dailide, who was never charged for his participation in the Kedainiai events, told two entirely different accounts of what transpired in Kedainiai on August 28, 1941. Initially, he testified that the defendant was in charge of a detachment which guarded the perimeter of the pit, that is, the "surrounding area," not the "shooting place." Subsequently, after Dailide was shown a Soviet protocol which he had signed in 1977, he changed his story, asserting that which was contained in the protocol was the "true evidence." More specifically, in conformity with the protocol, he testified that the defendant was directing the shooting (armed with a pistol) in the area of the ditch ("the shooting place"). Dailide was also unable to identify the defendant in a wartime photograph, stating only "it resembles Kungys."

stricted admission of this evidence, the district court concluded that the government had not met its burden of proof with respect to establishing the defendant's participation in these war crimes.

■ In refusing to admit the Soviet depositions other than for the limited purpose of demonstrating that the Kedainiai killings took place, the district court reasoned that the depositions were unreliable. The court held that their admission "would violate fundamental considerations of fairness," given the totality of the circumstances. 571 F.Supp. at 1123. We do not reach this evidentiary issue and therefore do not determine whether the defendant was a participant in the killings. Even with the exclusion of the Soviet depositions insofar as they implicate the defendant, we find the presence of sufficient evidence in the trial record to resolve the denaturalization issue.[2]

At trial, the government also contended that Kungys' citizenship should be revoked because he made false statements in the course of applying for entry into the United States and for citizenship. The government produced evidence that the defendant was born in Reistru on September 21, 1915, that he entered military service in 1938, which he left with the rank of junior lieutenant in late 1939, that he worked with the Bank of Lithuania in Kedainai from December 1, 1939 until mid-October 1941, that he moved to Kaunas thereafter, that in October 1944 he and his wife left Lithuania as the Soviet Army advanced thereon and moved to the Tuebingen region in Germa-

ny, which was then still under control of the Nazis, that Kungys applied for and received permission from the German authorities to reside in Tuebingen without special restrictions, and that his wife applied for permission to practice dentistry. Although records in Tuebingen accurately stated Kungys' true date and place of birth, when he applied for a visa application at the United States Consulate, his submissions included a forged Lithuanian Identity Card and a false birth record obtained from the Vatican representative in Germany.

The district court found, contrary to the defendant's claims, that he was a member of the Sauliai, a local Riflemen's association. This was an organization which gave military training to its members and which served as an auxiliary police force, assisting the German occupation.

The district court also found that the defendant misrepresented and concealed certain facts when applying for a visa and when petitioning for citizenship. It found, however, that these were not material. We note that the defendant initially denied making any such misrepresentations or concealing such information. The trial court, however, determined that that the defendant conceded that he did, and on appeal the defendant admits making the misrepresentations but argues that they are immaterial. These concern the defendant's date of birth, place of birth, wartime occupations and wartime residence. For the reasons which follow, we disagree with the district court's conclusion that these

---

**2.** Albeit in a different context, we have previously stated that the reliability of depositions taken in foreign countries should be judged on an individual basis. *See, e.g., United States v. Wilson,* 601 F.2d 95, 98 (3d Cir.1979). In any event, we reject the suggestion that all depositions taken in the Soviet Union should be automatically excluded from evidence. *Accord United States v. Schuk,* 565 F.Supp. 613, 615 (E.D.Pa.1983); *United States v. Linnas,* 527 F.Supp. 426, 433–34 & n. 16 (E.D.N.Y.1981); *United States v. Osidach,* 513 F.Supp. 51, 58 n. 2 (E.D.Pa.1981). *See also United States v. Trucis,* 89 F.R.D. 671 (E.D. Pa.1981) (refusing to prevent taking of depositions in Latvia). *Cf. United States v. Kowalchuk,* 773 F.2d 488 (3d Cir.1985) (in banc), *cert.*

*denied,* —— U.S. ——, 106 S.Ct. 1188, 89 L.Ed.2d 303 (1986) (Soviet-source depositions used); *United States v. Koziy,* 540 F.Supp. 25 (S.D.Fla. 1982), *aff'd,* 728 F.2d 1314 (11th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 130, 83 L.Ed.2d 70 (1984) (Soviet-source depositions used); *United States v. Kairys,* 782 F.2d 1374 (7th Cir. 1986) (Soviet-source depositions used). We note, however, that the U.S. Court of Appeals for the Ninth Circuit took a different approach in *Laipenieks v. INS,* 750 F.2d 1427, 1433 (9th Cir.1985) and reached the same result as the district court judge in the case *sub judice* when it questioned the trustworthiness of Soviet-source depositions.

misrepresentations were not material and reverse on this ground.

Finally, the district court rejected the government's claim that irrespective of materiality, the proof that false testimony was given in connection with the naturalization process, in and of itself, is sufficient grounds to demonstrate a lack of good moral character under 8 U.S.C. § 1101(f)(6) and would support the revocation of the defendant's citizenship as illegally procured. We agree with the district court on this point.

## IV.

### A.

There is no question that in a denaturalization proceeding the government "carries a heavy burden of proof," *Costello v. United States*, 365 U.S. 265, 269, 81 S.Ct. 534, 536, 5 L.Ed.2d 551 (1961), and that the evidence must be " 'clear, unequivocal, and convincing' " so not to leave " 'the issue in doubt.' " *Id., quoting Schneiderman v. United States*, 320 U.S. 118, 125, 158, 63 S.Ct. 1333, 1336, 1352, 87 L.Ed. 1796 (1943). *See also United States v. Kowalchuk*, 773 F.2d 488, 493 (3d Cir.1985) (in banc) *cert. denied*, —— U.S. ——, 106 S.Ct. 1188, 89 L.Ed.2d 303 (1986). To require less " 'would be inconsistent with the importance of the right that is at stake.' " *Id., quoting Fedorenko, supra*, 449 U.S. at 505–06, 101 S.Ct. at 747. Although the government possesses a high standard of proof, "a certificate of citizenship is not immune from challenge." *Kowalchuk, supra*, 773 F.2d at 493.

In this case, the government seeks the revocation of the defendant's citizenship under section 340(a) of the Immigration and Nationality Act of 1952, as amended, 8 U.S.C. § 1451(a) (1982).[3] By the express terms of the statute, in order to succeed in a denaturalization proceeding, the government must prove that the order granting citizenship was "illegally procured or [was] procured by concealment of a material fact or by willful misrepresentation." Notwithstanding the precise language of section 1451(a), the government must demonstrate both willfulness and materiality with respect to any misrepresentation or concealment. *Fedorenko, supra*, 449 U.S. at 507–08 n. 28, 101 S.Ct. at 748 n. 28. *See also, Kowalchuk, supra*, 773 F.2d at 495 n. 8.

Here, as in *Fedorenko*, the willfulness of the misrepresentations or concealments is not at issue. As noted above, the defendant conceded before the trial court that he made these concealments. On appeal, the defendant again admits making misrepresentations or concealments, but claims they were not material.[4] The government argues that it has proven materiality under *Chaunt* and argues additionally that under 8 U.S.C. § 1101(f)(6) materiality is not required. We examine each argument in turn.

1. Materiality Requirements of Misrepresentations or Concealments under the Second Prong of *Chaunt* and 8 U.S.C. § 1451(a).

In *Chaunt v. United States*, 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960), the Supreme Court had occasion to examine certain concealments made by the defendant in connection with his naturalization papers, *i.e.*, the fact that he had been arrested for his speechmaking and handbill

---

**3.** 8 U.S.C. § 1451(a) provides in pertinent part:
(a) It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any court specified in subsection (a) of section 1421 of this title in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization *on the ground that such order and certificate*

*of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate, respectively...*
(emphasis added).

**4.** *See, e.g.*, Appellee's Brief at 49, n. 48.

distributing activities more than the "critical" five years prior to the application. The *Chaunt* Court decided that the failure to disclose was not material, and in doing so, articulated a two-part materiality test, either prong of which, if demonstrated by the requisite burden of proof, could serve as the basis for revocation of citizenship:

(1) that facts were suppressed which, if known, would have warranted the denial of citizenship or (2) that their disclosure might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship.

*Id.* at 355, 81 S.Ct. at 151. The Court also stated that the "totality of the circumstances" should be taken into consideration when assessing materiality. *Id.* at 354, 81 S.Ct. at 150.

In *Fedorenko v. United States*, 449 U.S. 490, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), some twenty years after *Chaunt*, the Supreme Court again considered the materiality of certain concealments, but this time in the context of a visa application as well as a naturalization petition. In *Fedorenko*, the defendant received a visa under the Displaced Persons Act, Pub.L. No. 80–774, 62 Stat. 1009, *codified at* 50 U.S.C.App. §§ 1951–1965 (1982) ("DPA"). The Supreme Court affirmed the order revoking the defendant's citizenship because his citizenship was illegally procured in that he failed to comply with the Congressionally-imposed prerequisites to citizenship. Specifically, the defendant lied about his wartime activities on his visa application, *i.e.*, he claimed he was a farmer in Sarney, Poland during the war when in fact he was an armed guard at a concentration camp. Some thirty years later, after living in Connecticut as a "law-abiding" factory worker, the defendant applied for and obtained citizenship. His naturalization papers and sworn testimony likewise did not disclose his concentration camp service. At trial, the defendant admitted that he deliberately gave falsehoods in connection with his visa application, that he was an armed guard in a concentration camp, that he had an awareness of the atrocities, but claimed that he was forced to serve as a guard and denied that he was a participant.

The district court entered judgment for the defendant, finding that although he served as an armed guard and lied about his wartime activities, he served involuntarily. The Court of Appeals reversed, finding that the second prong of the *Chaunt* test "requires only clear and convincing proof that (a) disclosure of the true facts *would* have led to an investigation and (b) the investigation *might* have uncovered other facts warranting the denial of citizenship." *Fedorenko, supra,* 449 U.S. at 504, 101 S.Ct. at 746 (emphasis in original; footnote omitted). The Supreme Court, in a plurality opinion, affirmed, and in doing so, construed the DPA and articulated a materiality test, but without referring to *Chaunt:*

At the very least, a misrepresentation must be considered material if disclosure of the true facts would have made the applicant ineligible for a visa.

*Id.* at 509, 101 S.Ct. at 749, also quoted in the concurring opinion, *id.* at 520, 101 S.Ct. at 754 (Blackmun, J.). Consequently, because the *Fedorenko* Court did not couch its analysis in *Chaunt* terms, it did not decide if the *Chaunt* test also applies to false statements in visa applications.

The *Fedorenko* Court ultimately rejected the distinction between voluntary and involuntary service for DPA purposes. It held that the defendant's service as an armed guard in a concentration camp constituted assistance to the enemy under the DPA and that the defendant's "willful and material misrepresentations made for the purpose of gaining admission into the United States as an eligible displaced person" made him ineligible as a matter of law for a visa under the DPA. *Id.* at 514, 101 S.Ct. at 751. Therefore, the Court concluded that the defendant's "failure to comply with the statutory prerequisites for naturalization renders his certificate of citizenship revocable as 'illegally procured' under 8 U.S.C. § 1451(a)." *Id.*

Justice Blackmun concurred in the result, but articulated that he had difficulty in understanding why the opinion avoided a *Chaunt* discussion because he saw no "effective difference between the standards, nor any persuasive grounds for contriving a difference." *Id.* at 520. Justice Blackmun was concerned that the failure to term the test as one under *Chaunt* would risk confusion. Justice Blackmun stated:

> Confusion to some extent is already present. *We granted certiorari in this case primarily to resolve conflicting interpretations of the Chaunt materiality standard.* Compare *United States v. Riela,* 337 F.2d 986 (CA3 1964),[5] and *United States v. Rossi,* 299 F.2d 650 (CA9 1962), with *Kassab v. Immigration & Naturalization Service,* 364 F.2d 806 (CA6 1966), and *Langhammer v. Hamilton,* 295 F.2d 642 (CA1 1961).

449 U.S. at 521, n. 4, 101 S.Ct. at 757 n. 4 (emphasis added; footnote added).

Justice Blackmun also speculated that the Court's reluctance to rely expressly on *Chaunt* is a result of the confusion concerning whether *Chaunt* did in fact create two separate standards, notwithstanding its use of the disjunctive. Justice Blackmun expressed doubt as to whether there is really a second test (the "so-called second test"). *Id.* at 524, 101 S.Ct. at 756. He was concerned that if a weaker approach were taken under prong two, "the valued rights of citizenship [would be] in danger of erosion." *Id.* at 526, 101 S.Ct. at 757.

Justice White filed a dissenting opinion in which he articulated his conviction that *Chaunt* does encompass two separate tests and that under the second test the government need only prove that an investigation prompted by a truthful answer *"might have* led to the discovery of facts justifying denial of citizenship." *Id.* at 528, 101 S.Ct. at 758 (emphasis in original). Contrary to Justice Blackmun's interpretation, Justice White felt that to require the government to demonstrate materiality by showing that an investigation precipitated by the truth *would* have revealed facts justifying denial of the petition would encourage applicants to conceal the truth.

Justice Stevens also dissented and in doing so he interpreted the *Chaunt* test to encompass three components:

> The Court and the parties seem to assume that the *Chaunt* test contains only two components: (1) whether a truthful answer might have or would have triggered an investigation, and (2) whether such an investigation might have or would have revealed a disqualifying circumstance. Under this characterization of the *Chaunt* test, the only dispute is what probability is required with respect to each of the two components. There are really three inquiries, however: (1) whether a truthful answer would have led to an investigation, (2) whether a disqualifying circumstance actually existed, and (3) whether it would have been discovered by the investigation. Regardless of whether the misstatement

---

**5.** We need not discuss the vitality of *Riela* after *Fedorenko* (or after *Kowalchuk*) because we find its facts to be distinguishable as *Riela* turns on the defendant's failure to meet the Congressionally-imposed prerequisites to citizenship. In *Riela,* this court affirmed the judgment of the district court which canceled the defendant's certificate of naturalization, finding that he failed to meet the prerequisites to lawful admission. The defendant had entered this country as a stowaway, which made his admission and subsequent presence unlawful. Additionally, in his preliminary naturalization papers he misrepresented his date of birth, place of birth, and his date of arrival. He further misrepresented that he entered through Ellis Island, that he paid a head tax, that he was a cabin passenger, that he traveled on a passport and that he intended to

meet someone who was apparently unknown to him. In later documents he continued the misrepresentations.

After finding "knowingly false" statements contained in the "various documents," the *Riela* court examined the materiality issue. In doing so, it applied the first prong of *Chaunt,* but did not expressly state which facts it relied upon:

> There can be no doubt that the defendant, in every document filed, gave false answers to pertinent questions with the willful intent to deceive. The answers were material because they resulted in the suppression of facts which, if known, would have barred the naturalization of the defendant because of his obvious failure to meet the statutory requirements.

337 F.2d at 989.

was made on an application for a visa or for citizenship, in my opinion the proper analysis should focus on the first and second components and attach little or no weight to the third. Unless the Government can prove the existence of a circumstance that would have disqualified the applicant, I do not believe that citizenship should be revoked on the basis of speculation about what might have been discovered if an investigation had been initiated.

*Id.* at 536–37, 101 S.Ct. at 762–63.

Consistent with Justice Blackmun's concern that *Fedorenko* would generate confusion, cases that have followed have reached different conclusions concerning the materiality requirements under *Chaunt.*

In *United States v. Kowalchuk,* 773 F.2d 488 (3d Cir.1985) (in banc), *cert. denied,* —— U.S. ——, 106 S.Ct. 1188, 89 L.Ed.2d 303 (1986), we upheld the district court's order revoking the defendant's citizenship and canceling his certificate of naturalization and did so by applying the materiality test contained in the first prong of *Chaunt* to misrepresentations made at the visa stage.[6] In *Kowalchuk,* the defendant was issued a visa in 1949 under the DPA. The district court found that the defendant's visa was invalid as he was not a genuine refugee of concern to the International Refugee Organization and therefore was ineligible for admission into this country under the DPA. The trial court further held that the defendant obtained his visa illegally under section 10 of the DPA, 50 U.S.C.App. § 1959, because he made material misrepresentations on his visa application. The district court found that the defendant was a member of the Lubomyl, Poland militia (the "Schultzmannschaft") and that although the evidence did not demonstrate that he actually participated in the atrocities, the defendant "must have known" of them. We did not reach this issue.

In affirming, we concluded that the application of the first prong of the *Chaunt* test mandated revocation of the defendant's citizenship because had the particular facts been revealed, a visa would not have issued. Specifically:

[T]he defendant willfully concealed his voluntary membership and employment in the Ukrainian militia/police force, his residence at Lubomyl, his attendance at the special training school during the German occupation, and his voluntary flight to Czechoslovakia with the retreating German military forces.

773 F.2d at 496.

Although in *Kowalchuk* we ultimately resolved the matter on the first prong of *Chaunt,* we acknowledged the existence of the second prong and explained:

The second prong deals with a situation in which the truthful answer to a question would not by itself warrant the disqualification of the applicant. The Government may still demonstrate that the misrepresentation is material if it shows that the truthful answer 'might have been useful' in an investigation of the applicant 'possibly leading to the discovery of other facts warranting denial of citizenship.' *Chaunt,* 364 U.S. at 355, 81 S.Ct. at 151.

*Id.* at 496.

In *Maikovskis v. INS,* 773 F.2d 435 (2d Cir.1985), the U.S. Court of Appeals for the Second Circuit held that the defendant's concealments and misrepresentations on his visa application concerning his wartime residence and occupation were material within its definition of the second prong of *Chaunt.* While we recognize that *Maikovskis* is an alien deportation case, its interpretation of *Chaunt* is nonetheless instructive.

In applying for his visa under the DPA in 1953, Maikovskis stated that from Decem-

---

**6.** Other courts of appeals have also applied the *Chaunt* tests to visa applications. *See, e.g.,* Maikovskis v. INS, 773 F.2d 435, 441 (2d Cir.1985) and cases cited therein ("all of the Courts of Appeals that have considered the issue deem the *Chaunt* test applicable to misrepresentations in visa applications"). In cases such as this, when the misrepresentations are made at the visa stage and reiterated in the naturalization petition, we do not find any obstacles in applying the *Chaunt* considerations.

ber 1941 to October 1944, he was a book-keeper in Riga, Latvia. The truth was that he was a chief of police for a Nazi-dominated police force in Rezekne, Latvia, a Nazi-occupied area during that period. Moreover, through the defendant's own testimony at his deportation hearing, it was established that he had assisted the Nazis.

In interpreting prong two of *Chaunt,* the court of appeals noted three possible tests under which materiality could be proven by the government, *i.e.,* whether the concealments or misrepresentations would have led to the discovery of disqualifying facts under a "might possibly," a "reasonable probability" or a "certainty" standard. Without deciding if the "might possibly" test would be adequate, the court chose the "reasonable probability" over the "certainty" standard. In doing so the court stated:

> If material facts have successfully been concealed in the visa application documents, either by nondisclosure or by affirmative misrepresentation, the concealment has deprived the government of the opportunity to make an investigation into the alien's actual circumstances at a time when the truth would have been more easily discoverable. Thus, application of a certainty standard would encourage the alien to conceal material information in his visa application documents and reward him for the initial success of his nondisclosure. We conclude that once it has been shown that the alien made misrepresentations in his visa application, the materiality of the misrepresentations is established where the government shows that disclosure of the concealed information probably would have led to the discovery of facts warranting the denial of a visa.

*Id.* at 442.

In applying its "reasonable probability" standard, the *Maikovskis* court concluded that the defendant's failure to disclose his police service was material because knowledge of his position at the time of his visa application probably would have resulted in the discovery of his role with Nazi forces in arresting citizens and burning their village,

which would have made him ineligible for a visa under the DPA. Moreover, the evidence demonstrated that knowledge that any applicant served in the Latvian police force would have triggered an investigation to determine whether the individual assisted in the persecution.

We note that the U.S. Court of Appeals for the Tenth Circuit reached a different result when faced with this issue. In *United States v. Sheshtawy,* 714 F.2d 1038 (10th Cir.1983), the court adopted Justice Blackmun's interpretation of *Chaunt* (as explicated in *Fedorenko* ) and therefore effectively held that the second prong does not contain a separate test.

In *Sheshtawy,* the defendant was arrested for concealing stolen property after he filed his naturalization petition but before his hearing. After his arrest, he received a standard update questionnaire from the Immigration and Naturalization Service in which he was asked whether he had ever been arrested. The defendant falsely replied in the negative. (Subsequently, the criminal charges against him were dropped.) The trial court revoked the defendant's citizenship, holding that the truthful answer to the arrest question would have resulted in a delay in his naturalization investigation and that a truthful response might have had an effect on the granting of his petition. The Court of Appeals reversed, finding that the district court erroneously utilized the standard contained in the *Chaunt* dissent.

In embracing Justice Blackmun's version, the *Sheshtawy* court rejected the argument that such an interpretation encourages lying on naturalization papers by those with "disqualifying" or "doubtful" experiences and stated:

> The only group possibly affected are those who are uncertain whether a particular event would disqualify them from naturalization. We believe the *Chaunt* Court considered this tension and, in effect, concluded that even though there may be some who are encouraged to lie, the importance of putting naturalized citizenship well beyond the danger of un-

warranted revocation justified the adoption of so severe a test.

*Id.* at 1040–41.

The U.S. Court of Appeals for the Eleventh Circuit addressed the materiality issue on two occasions although we do not find either opinion instructive here. *See United States v. Palciauskas,* 734 F.2d 625 (11th Cir.1984), and *United States v. Koziy,* 728 F.2d 1314 (11th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 130, 83 L.Ed.2d 70 (1984).[7]

We turn now to the analysis by the district court on this issue. The district court found that the government had not proven materiality under prong one. With respect to the second prong of the *Chaunt* test, it acknowledged the different constructions and concluded that the government had not met its burden under any of them, including the least stringent of the tests, the one articulated by Justice White. Because we agree with the district court that under the first prong of *Chaunt* the government has not established that the requisite materiality, *i.e.,* "that facts were suppressed which, if known, would have warranted denial of citizenship," we must consider the second prong in the *Chaunt* test and articulate our view of this elusive concept, while remaining cognizant of its various interpretations.[8]

■ Although we acknowledge that there is some opinion that the second prong may not contain a standard separate from the first, we have recently recognized that *Chaunt* does encompass two alternate tests. *Kowalchuk, supra,* 773 F.2d at 496.

Moreover, consistent with that which we have stated in *Kowalchuk,* the second prong comes into play when a truthful answer at the time would not have necessarily resulted in denial of the application. In such a situation, citizenship may nonetheless be subject to revocation if the government is able to prove by clear, convincing and unequivocal evidence that the concealments or misrepresentation would have triggered an investigation which probably would have revealed disqualifying facts.

With respect to the investigation aspect, although there is no controlling authority which requires us to insist that the government prove that the truth at the time would have prompted an investigation, we find that this requirement is implied by the language of the second prong: "that their disclosure might have been useful in an investigation ..." 364 U.S. at 355, 81 S.Ct. at 151. We further note that Justice Stevens interprets the second prong to require that the government prove that an investigation would have taken place. *Fedorenko, supra,* 449 U.S. at 537, 101 S.Ct. at 762 (Stevens, J., dissenting). In any event, in the case at bar the government has demonstrated by unrebutted testimony that discrepancies between either the visa or the citizenship application and the supporting documents would have prompted an investigation.

After the government proves that an investigation would have transpired, the court must then concern itself with where the investigation would have led. We hold

7. In *Palciauskas,* the court affirmed the judgment of the district court revoking the defendant's citizenship because he concealed that he was the mayor of Kaunas, Lithuania during its period of Nazi occupation. Without mentioning *Chaunt* or *Fedorenko,* the court held this concealment to be material because the trial evidence clearly demonstrated that an investigation would have transpired, although his mayorship, in and of itself, would not have necessarily resulted in the denial of his visa. The *Koziy* court found that the district court's determination that the defendant's citizenship was procured by the concealment of a material fact was "not clearly erroneous" and adopted the *Fedorenko* materiality standard articulated by the

court of appeals. We have some difficulty with this analysis because the materiality conclusion of the district court is not a factual finding, and as such is not governed by the clearly erroneous standard and also because the *Fedorenko* materiality standard relied upon by the *Koziy* court is not precedential since the Supreme Court chose not to affirm on that ground.

8. We note, however, that had we resolved the evidentiary question in favor of admission, we would rely on the first prong of *Chaunt* since proof of participation in the atrocities would have automatically made him ineligible for citizenship.

that where the government is able to prove that such investigation *probably* would have led to the discovery of disqualifying facts, then the materiality test under the second prong of *Chaunt* is satisfied. In so holding, we do not resolve the issue of whether the materiality test under *Chaunt* is satisfied under the *possibly* standard, *i.e.*, whether the government need only show that the truth at the time of the application would have prompted an investigation and that such investigation would have *possibly* revealed the facts which would have made the applicant ineligible. As in *Maikovskis,* the facts presented to us do not require us to determine whether the most lenient standard, *i.e.*, the possibly standard, is sufficient. We are cognizant, however, that the express wording of *Chaunt* includes the language "might have been useful in an investigation" and "possibly leading to the discovery of other facts warranting the denial of citizenship." *Id.*

█ We also recognize that there are a variety of views as to the precise requirements of prong two of *Chaunt* and that a more stringent test, *i.e.*, a certainty test would serve to make challenges to citizenship more difficult. We also note, however, that citizenship is granted only after strict compliance with the Congressionally-defined prerequisites, and that failure to give honest and truthful responses is not to be encouraged or taken lightly. Moreover, if the government is deprived of the truth at the time of the application, it is hampered in its assessment of the application at a time when the truth would have been easier to ascertain. Consequently, we hold that once an individual has obtained citizenship after misrepresenting or concealing facts at either the visa or the naturalization stage, if the government can prove by clear, unequivocal and convincing evidence that these are material under the criteria set forth above, then citizenship is subject to revocation.

We do not wish to condone anything less than strict compliance with the naturalization requirements and therefore permit an approach which utilizes *Chaunt's* second prong. Contrary to Justice Blackmun's assertion, we do not feel that such a test would impermissibly endanger the "valued rights of citizenship." We acknowledge the importance of a naturalized citizen's security in retaining this precious acquisition, but we feel that the balance between that interest and the necessity for following the requirements in obtaining citizenship are met by interpreting the second prong in this fashion.

2. Materiality Requirements of False Testimony under 8 U.S.C. §§ 1101(f)(6) and 1451(a).

The government also argues that the defendant's citizenship can be revoked as illegally procured on the basis of his false testimony, regardless of materiality, under the provisions of 8 U.S.C. §§ 1101(f)(6) and 1451(a). Section 1451(a) includes a provision, added in 1961, which permits denaturalization where the "order and certificate of naturalization were illegally procured." Section 1101(f)(6) excludes from the definition of "a person of good moral character" "one who has given false testimony for the purpose of obtaining any benefits under this chapter." The government contends that because only a person of good moral character is eligible for naturalization, 8 U.S.C. § 1427(a), the defendant's action in contravention of section 1101(f)(6) renders his citizenship "illegally procured" pursuant to 8 U.S.C. § 1451(a) and merits denaturalization without considering the materiality of his statements.

The government relies in part on *Fedorenko* in which the Supreme Court explained:

[O]ur cases have also recognized that there must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship. Failure to comply with any of these conditions renders the certificate of citizenship 'illegally procured,' and naturalization that is unlawfully procured can be set aside. 8 U.S.C. § 1451(a); *Afroyim v. Rusk,* 387 U.S. 253, 267 n. 23, 87 S.Ct. 1660, 1667 n. 23, 18 L.Ed.2d 757 (1967).

**528**

*See Maney v. United States,* 278 U.S. 17, 49 S.Ct. 15, 73 L.Ed. 156 (1928); *United States v. Ness,* 245 U.S. 319, 38 S.Ct. 118, 62 L.Ed. 321 (1917); *United States v. Ginsberg,* 243 U.S. 472, 37 S.Ct. 422, 61 L.Ed. 853 (1917).

449 U.S. at 506, 101 S.Ct. at 747. The government contends that this language supports its proposition that the defendant can be denaturalized on the basis of his false testimony, without regard to materiality, under sections 1101(f)(6) and 1451(a). The false testimony, argues the government, need not meet the *Chaunt* materiality test in order to constitute illegal procurement under the provisions of sections 1101(f)(6) and 1451(a). The government further submits that the district court's imposition of a materiality requirement for false testimony under section 1101(f)(6) is "clearly contradicted" by our decision in *In re Haniatakis,* 376 F.2d 728 (3d Cir.1967). The government also contends that our decision in *Haniatakis* requires imposition of the provisions of section 1101(f)(6) without a requirement that the misrepresentation be material. Finally, the government argues that the legislative history of the amendment to section 1451(a) which added the illegal procurement language supports its proposition that a citizen can be denaturalized for giving false testimony absent a finding of materiality. *See* H.R. Rep. No. 1086, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.Code Cong. & Ad.News 2950, 2982–84.

We reject the proposition that the government can avoid the *Chaunt* materiality test by alleging illegal procurement in connection with section 1101(f)(6). The language from the *Fedorenko* opinion cited by the government was included in a discussion of the countervailing values at stake when the government attempts to strip a person of the "precious" right to citizenship. *Fedorenko, supra,* 449 U.S. at 505, 101 S.Ct. at 746. In that denaturalization action under the DPA, the Court found that because the interests of the citizen were so great, a disqualifying misrepresentation or concealment must not only be willful but must also be related to a material fact. *Id.*

at 507 & n. 28, 101 S.Ct. at 748 n. 28. While the Court was interpreting a different statutory provision than the one at issue here, our analysis reveals the Court's willingness to impose a materiality requirement before a naturalized citizen is stripped of his "precious" right on the basis of a misrepresentation.

Likewise, our decision in *Haniatakis* supports the proposition that a materiality requirement should be invoked in the denaturalization process even though it is not required in the naturalization context. In *Haniatakis,* we reversed a district court's order granting a petition for naturalization on the basis that the petitioner's misrepresentations, while not material, were sufficient to invoke the definition of good moral character provided in section 1101(f)(6) and, therefore, were sufficient to preclude naturalization. We were careful to distinguish, however, the naturalization process from that of denaturalization. We noted the Supreme Court's decision in *Chaunt* and explained:

> [I]n *Chaunt* the government attempted to withdraw the privileges of citizenship from one who had already been admitted to their benefits. What is involved here, on the other hand, is the decision whether the petitioner should be admitted to the benefits of that citizenship. Much turns on this distinction, since the immigration law historically has chosen to afford greater protections to those who have been admitted to citizenship.

376 F.2d at 731. This analysis is consistent with the traditional imposition of a heavy burden on those seeking citizenship in contrast to the heavy burden on government officials seeking to denaturalize one already awarded the status of a citizen. The Supreme Court explained this distinction in *Berenyi v. District Director, INS,* 385 U.S. 630, 87 S.Ct. 666, 17 L.Ed.2d 656 (1967):

> When the Government seeks to strip a person of citizenship already acquired, or deport a resident alien and send him from our shores, it carries the heavy burden of proving its case by 'clear, unequivocal, and convincing evidence.' But

when an alien seeks to obtain the privileges and benefits of citizenship, the shoe is on the other foot. He is the moving party, affirmatively asking the Government to endow him with all the advantages of citizenship. Because that status, once granted, cannot lightly be taken away, the Government has a strong and legitimate interest in ensuring that only qualified persons are granted citizenship. For these reasons, it has been universally accepted that the burden is on the alien applicant to show his eligibility for citizenship in every respect.

*Id.* at 636–37, 87 S.Ct. at 670–71 (footnotes omitted). Because the burdens are so very different in naturalization and denaturalization cases, we find that the naturalization decisions relied on by the government, including *Haniatakis* do not dictate disregard of the materiality requirement in the denaturalization context.

We also find that the legislative history of the illegal procurement amendment to section 1451(a) does not evince a clear intent of Congress to provide an escape from the materiality requirement in false testimony cases. Rather, the House Report indicates an intent to allow denaturalization based on substantive facts, where, for example, no fraud or concealment was involved, without a showing of willful misrepresentation or concealment. *See* H.R. Rep. No. 1086, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.Code Cong. & Ad. News 2950, 2982–84. The report indicates concern, for example, with naturalizations of those guilty of rape, fraud, and aid to illegal aliens. *Id.* at 2983. We believe Congress was concerned with cases where it was impossible to prove willful misrepresentation or concealment rather than with cases where the object of concealment was not material.

■ We adopt the view, heretofore articulated in *United States v. Sheshtawy,* 714 F.2d 1038, 1041 (10th Cir.1983), and impliedly accepted in *Haniatakis,* 376 F.2d at 731, and in *Maikovskis v. I.N.S.,* 773 F.2d 435, 440–41 (2d Cir.1985), that the *Chaunt* materiality test is invoked when the government attempts to denaturalize a citizen based on the false testimony provisions of section 1101(f)(6). We believe this disposition is consistent with the Court's decisions in both *Chaunt* and *Fedorenko.* The requirement that the government establish materiality before a citizen is denaturalized on the basis of the false testimony provisions of section 1101(f)(6) accords the proper respect for the importance of the right to citizenship discussed in *Fedorenko.* It precludes the stripping of that right for minor or insignificant errors in an applicant's testimony. The materiality requirement ensures that the burden properly remains on the government to overcome the strong presumptions that attach once citizenship is conferred. While all doubts must be resolved in favor of the United States in the naturalization process, *Berenyi, supra,* 385 U.S. at 637, 87 S.Ct. at 670, any doubts in denaturalization proceedings should be resolved in the citizen's favor. The rule adopted here is consistent with that principle. Consequently, our analysis under the "concealment of a material fact or willful misrepresentation" portion of section 1451(a) will be no different than that under the illegal procurement provision. We will not permit the government to escape the *Chaunt* materiality requirement by invoking section 1101(f)(6).

### B.

Having articulated the applicable standard under the second prong of *Chaunt,* we now turn to the specific concealments or misrepresentations made by the defendant to assess materiality in the matter before us.

In this regard, the district court found that the defendant had misrepresented or concealed several facts on his visa application and continued the falsehoods in his naturalization petition by swearing to the truth of the information contained in the visa papers, namely, (1) his date of birth: the defendant was born on September 21, 1915 rather than on October 4, 1913; (2) his birthplace: the defendant was born in Reistru, Lithuania rather than Kaunas, ·Lithua-

nia; (3) his wartime occupation: the defendant concealed the fact that from late 1939 until October, 1941 he worked as an accountant in a Kedainiai bank and that he had been a clerk-bookkeeper in a Kaunas brush and broom factory from December of 1941 to 1944 and stated instead that during that period he was a student, dental technician, forestry worker and farmer; and (4) his wartime residence: the defendant concealed that he had lived in Kedainiai from 1940–41, including the time of the July and August 1941 Kedainiai atrocities; instead he stated that he lived in Telsiai.

■ For the reasons which follow, we find that the misrepresentations or concealments made by the defendant about his date and place of birth are material under the second prong of *Chaunt* because had the defendant stated the truth at the time in either of his applications, the discrepancies between the application and the falsified supporting documents *would* have triggered an investigation, which in turn would have *probably* resulted in the denial of either his nonpreference quota immigration visa or his naturalization petition. We note the district court's statement that it could not "understand what benefit defendant expected to achieve by placing his birth in Kaunas rather than Reistra and by dating his birth October 4, 1913 rather than September 21, 1915 ... as he continued to use his own name." 571 F.Supp. at 1137. Our reading of the second prong of *Chaunt*, however, does not require that we examine or ascertain motives when determining materiality.

Ambassador Seymour Maxwell Finger, a former career Foreign Service Officer, testified at the trial of this action. Ambassador Finger, now retired, served as a vice-consul to the American Consulate in Stuttgart, Germany when the defendant applied for his visa. Processing visa applications was among the duties required of vice-consuls. Ambassador Finger testified that he processed approximately 1500 visa applications in Stuttgart. Although Ambassador Finger did not process the defendant's visa application, he testified as to the uniform standards in use at the relevant time.

As testified to by Ambassador Finger, in Germany at the time the defendant applied for his visa, there were only two types of quota immigration visas being issued: preference and nonpreference. As is reflected on his visa, the defendant received a nonpreference visa. This type was issued only to an individual who did not have close relatives in the United States but who was a victim of Nazi persecution. Preference visas were utilized only for those with close relatives here. There is no suggestion in the record that the defendant was eligible for a preference visa.

As explained by Ambassador Finger, visa applicants would write the required information on a form, and if the application met with preliminary approval, the applicant would be scheduled for an oral interview with a vice-consul. During this interview, the visa application would be reviewed, and the applicant would be requested to swear or affirm as to the truth of the statements contained therein. Prior to signing, corrections to the application were permissible—so long as they were in the nature of an oversight rather than a deliberate misrepresentation of "something significant."

Ambassador Finger also stated that applicants were required to submit supporting documentation such as a birth certificate.[9] When actual documents were not available, substitute documents were accepted to authenticate date and place of birth as well as identity. In the case of the defendant, substitute and supporting documents were used in his visa application. The defendant used a substitute document (Vatican birth record) which misrepresented his date and place of birth. Additionally, we note that the defendant submitted a document which also misstated his place of

---

9. Country of birth determined eligibility under the quota system. We note that although the defendant misrepresented his place of birth, he did not misrepresent in what country he was born. Therefore, this misrepresentation, in and of itself, did not have impact on his eligibility for a quota visa in general.

birth. This document was a certificate from the Lithuanian Ex-political Prisoners Central Committee ("Central Committee") dated June 19, 1946. Ambassador Finger testified that this document could be used to substitute for an actual birth certificate.

The Central Committee certificate is important for another reason as well. The certificate specifically states that the defendant was "persecuted by the Gestapo." Ambassador Finger testified that in considering visa applications, the consulate would rely upon expatriate groups such as the Central Committee to screen applicants and to determine eligibility requirements, *i.e.*, whether the applicant had close American relatives or was a victim of Nazi persecution. We find that, by submitting this document, the defendant attempted to prove that he was a victim of Nazi persecution.

Significantly, Ambassador Finger gave unrebutted testimony concerning what would transpire if discrepancies existed between the supporting documents and the visa application. If this happened, the supporting documents would be "called into question", and there "certainly would have been an investigation." We note that the regulations in effect at the time are consistent with this testimony:

> If a consular officer has reason to doubt the authenticity of a document submitted to him, he should take appropriate steps to determine whether such document may be accepted as genuine and properly issued.

22 C.F.R. § 61.329 (supp.1946).

The unrefuted testimony concerning policy of an official who interpreted and administered the immigration law during the relevant period should not be ignored. *Fedorenko, supra,* 449 U.S. at 511, 101 S.Ct. at 749. We find therefore that the government has established that if the defendant had been truthful on his application and submitted his falsified documents in support of his visa application, an investigation would have ensued.

We now turn, consistent with the second prong of *Chaunt,* to what the investigation probably would have revealed.

Ambassador Finger testified that immigration policy required "first check[ing] police records in any prior place of residence, particularly in Germany where such records were available." On the defendant's visa application, Kungys listed Poltrigen as a previous residence. Correspondence between district officers in Tubingen and municipal officials in Poltringen, discovered later in Tubingen by the government, reveals that Kungys lived in Poltringen without harassment, and "received a residence permit without special conditions...." This information would tend to discredit the defendant's claim that he was persecuted by Nazi Germany. As noted previously, Ambassador Finger testified that as a matter of immigration policy at that time in Germany immigration quota visas were issued only to those who had close American relatives or who had suffered persecution.

Based on this record, we conclude that truthful statements by Kungys would have led to an investigation, which in all probability would have revealed the disqualifying fact that the defendant had not been a victim of Nazi persecution and therefore would not have been eligible for a visa. In accordance with the foregoing, we find that the government has shown by clear, convincing and unequivocal evidence that the second prong of *Chaunt* has been satisfied with respect to misrepresentations or concealments made by the defendant in connection with his visa, *i.e.*, had the defendant told the truth at the time, an investigation would have transpired which in turn would have probably resulted in the denial of his visa because it would have tended to show that the defendant was not a victim of Nazi persecution.[10]

■ With respect to the defendant's misrepresentations or concealments concern-

---

**10.** We note that the defendant made two attempts to contradict this view of the facts. First, his counsel contended at oral argument that Ambassador Finger's statement that only persecution victims received visas in Germany at the time was an incorrect expression of policy, citing purportedly contrary policies announced by President Truman. We note that

ing his wartime occupations and residences, we agree with the district court that they do not pass the *Chaunt* materiality test. Unlike the situation with the defendant's birth data, these misrepresentations or concealments were not supported by falsified documents. Moreover, although we find these falsehoods to be troublesome, the evidence in the record is insufficient to demonstrate their materiality under the controlling standard. Because these misrepresentations, particularly those regarding his wartime residences, nonetheless cause us some concern, we review this evidence.

As Ambassador Finger further testified, and as found by the district court, at the time the defendant applied for his visa, the vice-consuls were required to make specific inquiries about the applicant's adulthood residences and occupations, especially during the years 1939 to 1945. The reason for the inquiry was to determine what happened to the applicant during Nazi occupation and if the applicant had any relationship to the occupying forces. As found by the district court: "Of particular interest in the case of Eastern Europeans was the applicant's residences and occupations during the 1939–45 period, since that information tended to indicate the applicant's relationship to the Nazi occupation forces." 571 F.Supp. at 1136.

With respect to his wartime residence, we are troubled by the fact that the de-

fendant deliberately concealed that he lived in Kedainiai at the time the July and August atrocities transpired and instead represented that he was in Telsiai—a town where a seminary is located and about which the record contains no evidence of atrocities.[11] Although this causes us some concern because there is no hard evidence in the record that the consulate officials in Stuttgart had knowledge of these particular atrocities at the time the defendant applied for his visa, and the government accordingly did not prove that knowledge of the defendant's residence would have prompted an investigation, we cannot conclude that this concealment alone was material under the second prong of *Chaunt.*

With respect to wartime occupations, Ambassador Finger testified that during the period of Nazi occupation of Lithuania, probably all of its factories were Nazi-dominated. In determining eligibility of an individual who worked in one of these factories, the important questions were the capacity of employment. According to Finger's testimony, a manager of such a concern would "raise some questions" where a "slave laborer" would not. The size of the operations and the type of factory would also be relevant. The trial court held that the defendant's actual wartime occupations would not have made a difference on his visa application, and that he exaggerated the managerial aspects of his position in other documents in evidence. The district

---

those presidential statements speak only in general terms concerning the need to resettle displaced persons and particularly orphaned children. The papers do not address the eligibility requirements of those seeking quota visas in Germany in 1947, and in no way do they contradict Ambassador Finger's testimony as to procedures in the Stuttgart consulate.

Second, the defendant offered the testimony of Yuozas Koncius, who was 20 years old in 1944 at the time he and Kungys entered Germany together. Koncius reported that shortly after arriving, he and the defendant were confined in what appeared to be a forced labor camp, but escaped after two or three days. This isolated incident does not disturb the conclusion that truthful statements by the defendant would have led to an investigation, and that that investigation would have cast doubt on his claim of persecution.

11. We acknowledge that Ambassador Finger testified that the fact that an individual resided in Kedainiai would not have raised any questions to him. We also note, however, that he testified that at the time of trial, some 35 years later, he did not specifically remember the name Kedainiai. We do not assign importance to the former statement because he did not specifically remember the name and because the import of his testimony is that a key factor in eligibility was the applicant's relationship, if any, with the occupying Nazi forces. As he testified, one way to determine the nature of such a relationship was to look at the occupant's residences during the period of occupation. It is undisputed that Kedainiai, in July and August, 1941, was the site of Nazi murders and that the defendant resided there during that period.

court found that he was no more than a clerk-bookkeeper. We agree that this position in a factory in a Nazi-occupied area is not one which would be considered managerial. Therefore, based upon the testimony of Ambassador Finger, we cannot find that the government has proven that the defendant's actual wartime occupation, standing alone, is material.

■ One final matter deserves attention. Because the Supreme Court has not specifically applied *Chaunt* to the visa stage, we will now examine the materiality of the defendant's misrepresentations at the naturalization stage, the setting wherein the Supreme Court announced the *Chaunt* test.

Immigration Judge Julius Goldberg, the defendant's naturalization examiner, testified before the district court. Regarding the procedure in force at that time, Judge Goldberg stated that during the required interview, applicants reviewed each question contained in the application and were given an opportunity to make corrections. Investigations were routinely waived when an examiner made the determination that the investigation would not produce anything significant. In the case of the defendant, it was Judge Goldberg who waived the field investigation. Judge Goldberg also testified, however, that had he been aware that an applicant had given false testimony to obtain a visa, such as date and place of birth as well as wartime occupations and residences, and had the applicant sworn to these falsehoods in the naturalization petition, then Judge Goldberg would have been required to recommend against naturalization.

Explaining further, Judge Goldberg testified that he would have first given the petitioner an opportunity to explain the differences. Depending on the answers given, he would direct a field investigation, refer the matter to the Immigration and Naturalization Service for a determination of what action to take, or if he determined that the false testimony was such that the applicant was not of good moral character, then he would recommend against naturalization.

From this testimony we conclude that with respect to the defendant, had he told the truth at the time he applied for his citizenship, the discrepancies between the truth and his visa materials would have resulted in either a field investigation or an outright denial of the petition. Had an investigation transpired, consistent with Ambassador Finger's testimony, such investigation probably would have resulted in a denial of the petition since it would have tended to prove his ineligibility for a visa in the first instance. In this case, as previously noted, the defendant's claim of persecution by the Nazis—which is directly related to eligibility—would be called into question. Therefore, based upon the foregoing, we conclude that the government has shown that the defendant made material misrepresentations at both the visa and naturalization stages so as to justify denaturalization.

V.

For the reasons stated herein, we will reverse the judgment of the district court and will remand for denaturalization proceedings.